IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-713

Filed 6 February 2024

Cumberland County, No. 97CRS47312

STATE OF NORTH CAROLINA

v.

KEVIN SALVADOR GOLPHIN, Defendant.

Appeal by defendant from order entered on or about 13 April 2022 by Judge Thomas H. Lock in Superior Court, Cumberland County. Heard in the Court of Appeals 23 May 2023.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Kimberly N. Callahan, for the State.*
>
> *Tarlton Law PLLC, by Raymond C. Tarlton, and Sidley Austin LLP, by Eamon P. Joyce, pro hac vice, Christina Prusak Chianese, pro hac vice, Peter J. Mardian, pro hac vice, Margaret K. Seery, pro hac vice, Brianna O. Gallo, pro hac vice, and Brian C. Earl, pro hac vice, for defendant-appellant.*

STROUD, Judge.

Defendant appeals from an order of the superior court sentencing him to life imprisonment without the possibility of parole based on an offense he committed while a juvenile. Because the sentencing court did not abuse its discretion by sentencing Defendant to life imprisonment without the possibility of parole, we affirm.

## I.    Background

In 1997, Defendant and his brother shot and killed two law enforcement officers when the officers attempted to arrest the brothers for stealing a car. Defendant was arrested, indicted, and tried, and in 1998 Defendant was found guilty by a jury of two counts of first-degree murder.[1] Defendant was 17 years, 9 months, and 2 days old at the time of the murders. The jury recommended Defendant be sentenced to death on each count of first-degree murder, and the trial court thereafter sentenced Defendant to death. Defendant appealed his convictions, and his convictions were upheld on direct appeal in *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000). Our Supreme Court has already addressed the underlying facts of this case, and we will refer to the Supreme Court's opinion as needed for the purposes of this appeal. *See id.*

In 2002, Defendant filed a motion for appropriate relief ("MAR") challenging his convictions and death sentences. Defendant asserted his trial counsel was ineffective and the first-degree murder indictments were facially defective. The trial court denied his motion in a written order dated March 2004.

In May 2004, Defendant filed a second MAR. The superior court stayed the proceeding pending the United States Supreme Court's decision in *Roper v. Simmons*,

---

[1] Defendant was also found guilty of two counts of robbery with a dangerous weapon, one count of assault with a deadly weapon with intent to kill, one count of discharging a firearm into an occupied vehicle, and one count of possession of a stolen vehicle. However, only the two murder convictions are at issue on appeal.

in which the Supreme Court ultimately ruled sentencing a juvenile to death was a violation of the Eighth Amendment to the United States Constitution. *See Roper v. Simmons*, 543 U.S. 551, 572-73, 161 L.Ed.2d 1, 23-24 (2005). The superior court held a resentencing hearing in December 2005, and Defendant was thereafter resentenced to mandatory life imprisonment without the possibility of parole.

In June 2012, the United States Supreme Court ruled a mandatory sentence of life imprisonment without the possibility of parole was unconstitutional for a juvenile, and a sentencing court must instead consider how juvenile offenders differ from adult offenders. *See Miller v. Alabama*, 567 U.S. 460, 479-80, 183 L.Ed.2d 407, 424 (2012). A month later, in July 2012, the North Carolina General Assembly revised our sentencing statutes to remove mandatory life sentences without the possibility of parole for juveniles convicted of murder and enacted a discretionary sentencing framework that permitted a sentencing court to sentence a juvenile offender to either life imprisonment with or without the possibility of parole after considering several factors. *See* 2012 N.C. Sess. Laws 2012-148, § 1; N.C. Gen. Stat. §§ 15A-1340.19A (2012) *et seq*.

In 2016, the United States Supreme Court further determined that the law from *Miller* must be applied retroactively to juveniles already sentenced to mandatory life imprisonment without the possibility of parole. *See Montgomery v. Louisiana*, 577 U.S. 190, 206, 193 L.Ed.2d 599, 618 (2016). On or about 23 January 2018, Defendant filed another MAR alleging his sentences of life without parole were

unconstitutional under *Miller* and *Montgomery*. On 19 July 2018, the superior court granted Defendant's motion and ordered a second resentencing hearing for December 2018.

The resentencing hearing was held in April 2022. The State presented testimony from the officer who performed the initial investigation of the 1997 murders. The officer testified as to the facts underlying the murders, which are consistent with our Supreme Court's recitation in *State v. Golphin*. *See generally Golphin*, 352 N.C. at 380-88, 533 S.E.2d at 183-88. The State also presented victim impact testimony from the family members of the slain officers.

Defendant presented expert testimony regarding his mental state and maturity. Dr. Duquette, an expert on child psychology, pediatric neuropsychology, and mental and psychiatric disorders, performed an examination on Defendant in 2019 when Defendant was thirty-nine years old. Dr. Hilkey, an expert in forensic psychology, also testified about his psychological evaluation of Defendant. Dr. Hilkey met Defendant four times as part of his evaluation. Dr. Hilkey testified his report was also specifically for the purpose of evaluating whether Defendant was "eligible or meets criteria for a reconsideration for parole as is defined in Miller v. Alabama." In addition to Drs. Duquette's and Hilkey's reports, Defendant also admitted into evidence social worker records of his abusive childhood, about 300 pages of Department of Public Safety disciplinary records, additional mental health records and assessments by correctional staff, child protective services records, Defendant's

academic records, and a letter from Defendant's wife.

Defendant also testified on his own behalf. Defendant stated he had little structure in his life until he was incarcerated. Defendant also testified he received little psychological or psychiatric treatment before 1997. Defendant stated he had improved mentally while incarcerated by reading, writing, meditating, praying, and taking advantage of optional mental health and anger management programs. Defendant also earned his GED and testified he wanted to continue his education by taking college courses in psychology and sociology with the goal of counselling other at-risk youths. Defendant further testified his plan in 1997 to steal a car and flee to Virginia was "dumb[,]" and he would inevitably be apprehended. Defendant testified the plan was "[t]o steal a car, go to Richmond, rob the Food Lion that [Defendant] used to work at, build up enough money to go to St. Petersburg, Florida and from there, try to leave the country." Defendant testified he made a mistake and regretted the events leading to the murder of the two law enforcement officers, and he felt remorse for killing Trooper Lowry and Deputy Hathcock.

The State then presented victim impact testimony from the family of the officers. Trooper Lowry's widow testified that her husband's murder had a life-long impact on her and her children. Trooper Lowry's widow testified no family should have to go through the resentencing hearings. Trooper Lowry's brother gave similar testimony. The State also submitted a record of Defendant's disciplinary infractions while incarcerated showing Defendant had frequent issues up until 2014. Since 2014,

Defendant only had two disciplinary infractions, and Defendant was "counseled" on both; the record does not indicate the severity of a "counseled" infraction but does indicate that no punishment was imposed.

The superior court entered a written order ("Sentencing Order") in April 2022. The superior court first concluded the factors listed in *Miller* were subsumed into nine factors set out in North Carolina General Statute Section 15A-1340.19B(c). Based on the evidence presented at the resentencing hearing and "the factual summary of the crimes contained in *State v. Golphin*, 352 N.C. 364 (2000)[,]" the superior court found the following as to mitigating factors:

> 1.    **Age at the time of the offense.** Defendant was 17 years, 9 months, and 2 days old at the time of these murders. His age stands in stark contrast to that of the defendants in *Miller,* who were 14 years old at the time of the murders of which they were convicted. In that this defendant was less than three months from his eighteenth birthday, the court assigns this factor little mitigating weight.
>
> 2.    **Immaturity.** The defendant was immature at the time of the murders, but not in any way substantially different from other teens of his chronological age. The court finds this factor carries no significant mitigating weight.
>
> 3.    **Ability to appreciate the risks and consequences of the conduct.** The court finds the defendant suffered from some diminished impulse control at the time of the murders. On the other hand, Defendant, together with his slightly older brother, planned and committed an armed robbery in South Carolina earlier that day, stole an automobile, and were attempting to drive to Virginia on I-95 when Trooper Lowry stopped the vehicle.

- 6 -

The evidence shows Defendant was aware he was about to be arrested for the South Carolina crimes and made the decision to resist arrest. The evidence further shows that Defendant and his brother immediately fled the scene of the murders in the stolen car. Shortly thereafter, Defendant and his brother switched positions in the vehicle, and Defendant then drove the car alongside the vehicle of a witness to the murders so that his brother could shoot a rifle at the witness. When Defendant wrecked the automobile while fleeing from law enforcement officers giving chase, he ran from the vehicle toward a group of tractor-trailers parked near a tire repair shop in an effort to avoid apprehension. Defendant's actions demonstrate an ability to appreciate the risks and consequences of his criminal conduct. Hence, the court finds this factor carries little mitigating weight.

4. **Intellectual capacity.** Defendant's educational records suggest he suffered from a possible learning disorder. However, his academic performance improved significantly during the times he was enrolled in the in-patient treatment facilities, the Virginia Treatment Center for Children and Thirteen Acres. Defendant's cognitive functioning was tested in June, 1992 when he was 12 years old, and his full-scale IQ was determined to be 84. In March, 2019, Dr. Peter Duquette administered an IQ test to Defendant and measured his full-scale IQ at 87, lending credence to the earlier score. These scores are in the low average range of IQ scores. The court does not find Defendant's intellectual capacity to be so diminished as to give it any mitigating weight.

5. **Prior record.** The evidence regarding Defendant's prior experience with the juvenile justice system is relatively sparse. Defendant had juvenile delinquency dispositions that apparently stemmed from conflicts with his mother, and he reportedly had received juvenile probation for offenses involving assault and resisting arrest. The court finds this factor to have slight mitigating value.

6. **Mental health.** As a child, Defendant was diagnosed with oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), and dysthymic disorder. Defendant at no time has exhibited any symptoms of psychosis. Defendant suffers from posttraumatic stress disorder as a result of severe childhood physical and emotional abuse. Though this abuse was tragic, Defendant's mental disorders did not impair his ability to appreciate the risks and consequences of his criminal conduct. The court does not find Defendant's mental health to carry any mitigating weight.

7. **Familial or peer pressure exerted upon the defendant.** Defendant's closest relationship was with his slightly older brother, Tilmon. Though Defendant was about a year and a half younger than his codefendant, Defendant, by his own admission, primarily planned the robbery in South Carolina, and was driving the stolen vehicle at the time Trooper Lowry stopped it. Moreover, Defendant's actions precipitated the Golphins' violent encounter with the law enforcement officers when Defendant refused to submit to Trooper Lowry's command to place his hands behind his back. Defendant appears to have occupied the leadership role in his relationship with his brother and in the commission of their crimes on 23 September 1997. The court does not find this factor to have any mitigating weight.

8. **Likelihood that the defendant would benefit from rehabilitation in confinement.** Upon his incarceration in prison, Defendant committed approximately two dozen infractions that resulted in disciplinary action, including sanctions for disobeying orders and cursing officers. Most notably, Defendant spent almost a decade in solitary confinement due to his participation in an escape plot. Defendant resisted a strip search in 2014 and threatened a correctional officer with a broom handle. Though Defendant's conduct in prison has improved since 2014, improved behavior often accompanies maturation. Aside from some improvement in the level of his disruptive behavior, the court finds no credible evidence

that Defendant has experienced any true rehabilitation and assigns this factor no significant weight.

9. **Any other mitigating factor or circumstance.** The court has considered all the evidence presented, and, in particular, has considered the two mitigating circumstances found by the jury at the time of Defendant's original sentencing hearing: the age of the defendant at the time of the crimes, and the defendant's lack of parental involvement or support in treatment for psychological problems. The court analyzed Defendant's age and immaturity in numbered paragraphs (1) and (2) above, and the court analyzed Defendant's childhood psychological problems in paragraph number (6) above. The court again finds these factors to carry no or little mitigating weight, and the court finds no other mitigating factor or circumstance.

Based on these statutory mitigating factors and the circumstances of the murders, the superior court "conclude[d] that Defendant's crimes demonstrate his permanent incorrigibility and not his unfortunate yet transient immaturity" and sentenced Defendant to consecutive sentences of life imprisonment without the possibility of parole for both first-degree murder convictions. Defendant appealed.

## II. Standard of Review

Orders weighing the *Miller* factors and sentencing juveniles are reviewed for abuse of discretion. *State v. Sims,* 260 N.C. App. 665, 671, 818 S.E.2d 401, 406 (2018) ("The [sentencing] court's weighing of mitigating factors to determine the appropriate length of the sentence is reviewed for an abuse of discretion[,] . . . [i]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." (citation and quotation marks omitted)). "Abuse of discretion results where the

court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

## III.    Sentencing

We begin with a brief summary of relevant constitutional law as to the sentencing of juvenile homicide offenders.

## A.  Constitutional Standards

Defendant was tried in 1998 for the first-degree murder of two law enforcement officers, and during the sentencing portion of his trial he was sentenced to death. However, after he was sentenced and before his execution, the United States Supreme Court determined in *Roper v. Simmons* that the imposition of the death penalty on juvenile offenders was unconstitutional under the Eighth Amendment. *See Roper*, 543 U.S. at 569-70, 161 L.Ed.2d at 21-23. The Supreme Court concluded the maximum constitutionally allowed punishment for a juvenile offender, even one who commits first-degree murder, was life imprisonment without the possibility of parole. *Id.* at 572, 161 L.Ed.2d at 23.

The Supreme Court later held in *Miller v. Alabama* that imposing a *mandatory* sentence of life imprisonment without the possibility of parole on a juvenile also violates the Eighth Amendment. *See Miller*, 567 U.S. at 465, 183 L.Ed.2d at 414-15. Nonetheless, a sentence of life imprisonment without the possibility of parole is still permissible, but the sentencing framework in any given jurisdiction must allow the

sentencing authority the discretion to consider those unique characteristics of youth and the possibility of imposing a sentence less than the maximum permissible punishment under the Eighth Amendment. *See id.* at 474-76, 183 L.Ed.2d at 420-22.

In response to the Supreme Court of the United States decisions, North Carolina General Statute Section 15A-1340.19A was created to apply when sentencing juveniles "convicted of first degree murder[.]" *See* N.C. Gen. Stat. § 15A-1340.19A (2021). North Carolina General Statute Section 15A-1340.19B establishes nine factors a defendant may submit mitigating evidence on:

> (c) The defendant or the defendant's counsel may submit mitigating circumstances to the court, including, but not limited to, the following factors:
> (1)  Age at the time of the offense.
> (2)  Immaturity.
> (3)  Ability to appreciate the risks and consequences of the conduct.
> (4)  Intellectual capacity.
> (5)  Prior record.
> (6)  Mental health.
> (7)  Familial or peer pressure exerted upon the defendant.
> (8)  Likelihood that the defendant would benefit from rehabilitation in confinement.
> (9)  Any other mitigating factor or circumstance.

N.C. Gen. Stat. § 15A-1340.19B(c) (2021). The sentencing court must consider these factors "in determining whether, based upon all the circumstances of the offense and the particular circumstances of the defendant, the defendant should be sentenced to life imprisonment with parole instead of life imprisonment without parole." *See* N.C. Gen. Stat. § 15A-1340.19C(a) (2021). North Carolina General Statute Section 15A-

1340.19C further requires that a sentencing court's order sentencing a juvenile defendant convicted of murder "shall include findings on the absence or presence of any mitigating factors and such other findings as the court deems appropriate to include in the order." *Id.* The Supreme Court of North Carolina has concluded this statutory sentencing scheme is constitutional and gives effect to "the substantive standard enunciated in *Miller*." *State v. James*, 371 N.C. 77, 89, 813 S.E.2d 195, 204 (2018).

In addition, our Supreme Court has imposed another requirement, above and beyond those required by the Eighth Amendment, when a sentencing court sentences a juvenile defendant to life imprisonment without the possibility of parole. *See State v. Kelliher,* 381 N.C. 558, 587, 873 S.E.2d 366, 387 (2022). In *Kelliher*, our Supreme Court determined under Article I, Section 27 of the North Carolina Constitution that "juvenile offenders are presumed to have the capacity to change" and an express finding of fact as to a juvenile's permanent incorrigibility is required before a juvenile can be sentenced to life imprisonment without the possibility of parole. *See id.* ("Thus, unless the [sentencing] court *expressly finds* that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated, he or she *cannot* be sentenced to life without parole." (emphasis added)). Accordingly, a sentencing court must consider the factors in North Carolina General Statute Section 15A-1340.19B *and* "expressly find[] that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated" to sentence a juvenile to life

imprisonment without the possibility of parole. *Id.*

## B. Defendant's Arguments

We first note that Defendant did not challenge any of the sentencing court's findings of fact as unsupported by competent evidence. The sentencing court's findings are therefore binding on appeal. *In re K.W.*, 282 N.C. App. 283, 286, 871 S.E.2d 146, 149 (2022) (noting unchallenged findings of fact are binding on appeal). Defendant's arguments are numerous and, in many places, overlap or repeat themselves. For clarity, we will group Defendant's arguments into two major categories. Generally, Defendant contends the superior court incorrectly weighed the evidence of mitigation when applying the factors codified in North Carolina General Statute Section 15A-1340.19B(c). Defendant also argues the superior court should have come to the opposite conclusion and sentenced him to consecutive sentences of life imprisonment with the possibility of parole instead of life imprisonment without the possibility of parole.

### 1. *State v. Kelliher*

Defendant's first group of arguments is based on *State v. Kelliher*, 381 N.C. 558, 873 S.E.2d 366. Defendant contends: (1) our Supreme Court's opinion in *State v. Kelliher* requires this Court to reverse the Sentencing Order because, under *Kelliher*, no juvenile who "can be rehabilitated" can be sentenced to life imprisonment without the possibility of parole; (2) Defendant not only has the potential for rehabilitation, as identified in *Kelliher*, but the evidence admitted at the resentencing

hearing conclusively shows that Defendant *has already been* rehabilitated and is therefore parole eligible; and (3) because Defendant is eligible for parole, he must be parole eligible within forty years of his incarceration.

As to Defendant's argument that "the North Carolina Supreme Court held that this State's Constitution prohibits [life without the possibility of parole] for a juvenile offender who 'can be rehabilitated[,]'" we agree. But Defendant's argument as to how *Kelliher* applies to him *only* takes issue with the weight and credibility the sentencing court assigned to the evidence heard at the resentencing hearing. In Defendant's view, the sole conclusion that could be supported by the evidence was that Defendant was capable of reform, was in fact reformed, and therefore, must be parole eligible within 40 years of his incarceration. However, Defendant did not challenge the sentencing court's findings of fact as unsupported by the evidence, so those findings are binding on appeal. *See In re K.W.*, 282 N.C. App. at 286, 871 S.E.2d at 149. And "[t]he [sentencing] court's weighing of mitigating factors to determine the appropriate length of the sentence is reviewed for an abuse of discretion[,] . . . [i]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." *Sims,* 260 N.C. App. at 671, 818 S.E.2d at 406 (citation and quotation marks omitted). Accordingly, we turn to the factors considered by the sentencing court.

### 2. *Mitigating Factors*

Defendant's second group of arguments is based on how the Court weighed mitigating factors. Defendant asserts the sentencing court erred (1) in applying

North Carolina General Statute Section 15A-1340.19B(c), which codified the *Miller* factors, by "ignoring uncontradicted, credible evidence as to" mitigating factors and (2) by relying on the jury's findings regarding additional mitigating factors at the 1998 trial.

North Carolina General Statute Section 15A-1340.19B(c) sets out nine mitigating factors, and North Carolina General Statute Section 15A-1340.19C requires the sentencing court to consider each factor if evidence is presented on that factor. *See* N.C. Gen. Stat. §§ 15A-1340.19B; 15A-1340.19C. Defendant presented evidence on all nine factors and raises arguments regarding the sentencing court's weighing as to each factor. Further, the sentencing court must also "expressly find[] that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated" to sentence a juvenile to life imprisonment without parole. *Kelliher*, 381 N.C. at 587, 873 S.E.2d at 387.

### a. *Age at the Time of the Offense*

The first factor the sentencing court considered was Defendant's "[a]ge at the time of the offense." N.C. Gen. Stat. § 15A-1340.19B(c)(1). The sentencing court found "Defendant was 17 years, 9 months, and 2 days old at the time of these murders." Compared to the defendants in *Miller*, who were 14 years old, the sentencing court assigned Defendant's age "little mitigating weight." *See Miller*, 567 U.S. at 466, 183 L.Ed.2d at 414. Defendant does not challenge this finding as unsupported by the evidence. Instead, Defendant contends the sentencing court

should have weighed this fact differently.

Defendant asserts this factor should have been assigned a greater weight, but "[i]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." *Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406. Defendant contends that by assigning his age "little mitigating weight" the sentencing court essentially rewrote *Miller* and his age should have been accorded "substantial mitigating weight" instead. Defendant does not argue *why* the sentencing court's comparison to *Miller* was an abuse of discretion. Nor does Defendant argue there was no competent evidence to support this finding.

While Defendant was under 18 years old when he participated in killing the law enforcement officers, he was less than 3 months from his 18th birthday, which differs greatly from the 14-year-olds in *Miller*, where the factor weighed heavier. *See Miller*, 567 U.S. at 466, 183 L.Ed.2d at 414. The sentencing court's reasoning for assigning "little mitigating weight" to Defendant's age is clear.

*b. Immaturity*

The sentencing court next considered Defendant's "[i]mmaturity" in 1997, at the time of the murders. *See* N.C. Gen. Stat. § 15A-1340.19B(c)(2). The sentencing court found Defendant "was immature at the time of the murders, but not in any way substantially different from other teens of his chronological age. The court finds this factor carries no significant mitigating weight." Again, Defendant does not contend this finding was unsupported by the evidence but argues the sentencing court ignored

competent evidence, namely Dr. Hilkey's and Dr. Duquette's reports and testimony, when it assigned this factor "no significant mitigating weight." Defendant asserts the evidence presented could only support the conclusion that he was substantially less mature than his fellow 17-year-olds at the time of the murders.

When Dr. Duquette was asked "did Mr. Golphin have the emotional and behavioral maturity of a much younger boy?" Dr. Duquette answered "my read of that is yes. Without having examined Mr. Golphin at that age, *it's hard for me to know with absolute certainty* but yes, I think so." (Emphasis added.) Dr. Duquette also testified that "adolescents are notorious for, you know, some level of impulsive behavior and sensation seeking[,]" a hallmark of adolescence is an inability to consider the consequences of their actions, and "that [adolescents'] brains may not be fully ready to handle all of that responsibility" of adulthood.

Dr. Hilkey testified that Defendant likely had an underdeveloped frontal cortex when he was 17 years old, but Dr. Hilkey's assessment was based entirely on the records of other entities during Defendant's childhood and his own observations of Defendant 25 years after the murders. Additionally, Dr. Hilkey testified Defendant was aware the purpose of the assessment was for resentencing under *Miller* and that the results might have been skewed by Defendant's answers to the self-assessment portion of Dr. Hilkey's evaluation of Defendant if Defendant were untruthful. Additionally, while these assessments have "some degree of confidence[,]" estimating the impact a Defendant's answers may have on the assessment is still "not an exact

science."

Ultimately, as to Defendant's maturity at 17 years old, the sentencing court needed to make a credibility determination as to the evidence presented at the resentencing hearing and "pass upon the credibility of certain evidence and . . . decide what, or how much, weight to assign to it." *Sims*, 260 N.C. App. at 675, 818 S.E.2d at 409 (citation, quotation marks, and original brackets omitted). As to that weight, once again, "[i]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." *Id.* at 671, 818 S.E.2d at 406. As noted by Dr. Hilkey, while Defendant's experts were highly-experienced and well-qualified, compensating for any potential skewing of results is "not an exact science," and there was competent evidence in the record to support a determination that Defendant's maturity was not significantly less than other 17-year-olds at the time of the murders. *See id.*

### c. *Ability to Appreciate the Risks and Consequences of the Conduct*

The sentencing court then considered Defendant's "[a]bility to appreciate the risks and consequences of [his] conduct[,]" including the murders and circumstances leading to the murders. N.C. Gen. Stat. § 15A-1340.19B(c)(3). The sentencing court found Defendant had some diminished impulse control, but also that Defendant planned an armed robbery, including how he and his brother would escape. The sentencing court also found Defendant was aware that he was about to be arrested and decided to resist arrest, that he immediately fled the scene of the shooting, that he fled on foot after he wrecked the stolen car, and that Defendant tried to "avoid

apprehension." The sentencing court found "Defendant's actions demonstrate an ability to appreciate the risks and consequences of his criminal conduct. Hence, the court finds this factor carries little mitigating weight."

Defendant asserts the evidence showed he, at most, only knew right from wrong. Defendant asserts his plan "was the plan of a child[,]" that "all but guaranteed he would be caught." Defendant asserts the expert testimony and reports can only support a conclusion that he was unable to appreciate the risks and consequences of his conduct, and that his poorly thought-out plan only further supports this conclusion.

Again, Defendant simply casts the evidence in the light most favorable to the outcome he desires and asserts only one reasonable conclusion could be drawn from the evidence. But there was competent evidence in the record showing Defendant could appreciate risk and consequences. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406. The sentencing court took judicial notice of our Supreme Court's opinion in *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000), to which we defer for a full recitation of the evidence presented at Defendant's 1998 trial, including Defendant's fleeing from police and attempt to hide one of the officers' weapons before he was apprehended. *See Golphin*, 352 N.C. at 384-88, 533 S.E.2d at 186-87. A defendant trying to hide inculpatory evidence and fleeing from the scene of a shooting is competent evidence that supports a finding Defendant was able to appreciate the risks of his conduct. *See Sims*, 260 N.C. App. at 676, 818 S.E.2d at 409. Like the case

in *Sims*, "[D]efendant essentially requests that this Court reweigh the evidence which the [sentencing] court was not required to find compelling[,]" which we will not do. *Id.* (citing *Golphin*, 352 N.C. at 484, 533 S.E.2d at 245).

*d. Intellectual Capacity*

Next, the sentencing court considered Defendant's "[i]ntellectual capacity" in 1997. N.C. Gen. Stat. § 15A-1340.19B(c)(4). The sentencing court found Defendant suffered from a learning disability, his academic performance improved while enrolled at the inpatient care facility, and that Defendant's IQ was "in the low average range of IQ scores." The sentencing court found Defendant's intellectual capacity was not "so diminished as to give it any mitigating weight."

Defendant again argues the sentencing court ignored his evidence, but the sentencing court's finding was supported by evidence presented by Defendant's own expert witnesses. Dr. Duquette's report states Defendant "has a well-documented history of learning disability[;]" Defendant's stay at the inpatient care facility "represented [his] most successful academic period of growth[;]" and Defendant's "cognitive testing showed low average intelligence (WISC-III: Full Scale IQ=84)." Dr. Hilkey's report states Defendant's academic records indicate his "[i]nformation processing speed is impaired, as is behavioral initiation. These deficits are consistent with his diagnosed learning disability[;]" Defendant improved during his two years at the inpatient facility; and Defendant "appeared to be functioning in an average to low average intellectual range based on interview behaviors" during the 2019

assessment. These reports are competent evidence to support the sentencing court's fourth finding that Defendant was in the low to average IQ range. Again, Defendant asks us to disturb the weight the sentencing court assigned to the evidence presented below, which this Court has repeatedly held is not our role. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

### e. Prior Record

The sentencing court then considered Defendant's "[p]rior record" at 17 years old. N.C. Gen. Stat. § 15A-1340.19B(c)(5). The sentencing court found "Defendant's prior experience with the juvenile justice system is relatively sparse[,]" with "dispositions that apparently stemmed from conflicts with his mother, and he reportedly had received juvenile probation for offenses involving assault and resisting arrest." The sentencing court found this factor to have "slight mitigating value."

Once again, Defendant does not challenge the sentencing court's finding as to his prior record but claims it should have given it greater mitigating value. Defendant argues "[i]n light of the substantial and undisputed evidence of abuse and trauma that his mother inflicted, it is unreasonable to use" the offenses involving his mother "to undercut the *proper weight of this factor*." (Emphasis added.) But the sentencing court considered the evidence regarding Defendant's abuse as a child by his mother, made findings about this abuse, and considered this along with the other factors. We are not permitted to second-guess the sentencing court. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406. Defendant apparently also "had received

juvenile probation for offenses involving assault and resisting arrest" that did not stem from his mother, although these offenses were "relatively sparse." Defendant does not make any arguments regarding the offenses not involving his mother, and the sentencing court assigned some mitigating value based on Defendant's minimal criminal record. Again, Defendant asks this Court to weigh the evidence presented differently, and we will not. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

### f. *Mental Health*

The sentencing court next considered Defendant's "[m]ental health" diagnoses and their impact on his behavior. N.C. Gen. Stat. § 15A-1340.19B(c)(6). The sentencing court found Defendant:

> was diagnosed with oppositional defiant disorder, attention deficit hyperactivity disorder (ADHD), and dysthymic disorder. Defendant at no time has exhibited any symptoms of psychosis. Defendant suffers from posttraumatic stress disorder as a result of severe childhood physical and emotional abuse. Though this abuse was tragic, Defendant's mental disorders did not impair his ability to appreciate the risks and consequences of his criminal conduct.

The sentencing court found Defendant's mental health diagnoses did not "carry any mitigating weight."

Defendant asserts the sentencing court erred because (1) "the court rewrote [this factor] by requiring mental health issues cause, or be linked to, the offense[;]" (2) the court merged this factor into the third factor, Defendant's ability to appreciate the risks and consequences of his conduct; and (3) the court's finding Defendant's

"mental health conditions played no role in his crime is irreconcilable with the uncontradicted record."

The sentencing court did not rewrite North Carolina General Statute Section 15A-1340.19B(c)(6) by linking Defendant's mental health to the circumstances of the murders. North Carolina General Statute Section 15A-1340.19B(c)(6) lists "[m]ental health" as a factor, and the sentencing court is required to "consider any mitigating factors in determining whether, *based upon all the circumstances of the offense and the particular circumstances of the defendant*, the defendant should be sentenced to life imprisonment with parole instead of life imprisonment without parole." N.C. Gen. Stat. § 15A-1340.19C(a) (emphasis added). Here, the sentencing court did not err by considering Defendant's mental health disorders in the context of "the circumstances of the offense and the particular circumstances of the defendant[.]" N.C. Gen. Stat. § 15A-1340.19C(a). North Carolina's sentencing framework does not require the sentencing court to consider Defendant's "mental health" in a vacuum, and the sentencing court must necessarily consider the effect of Defendant's mental health on his criminal conduct. *See generally* N.C. Gen. Stat. § 15A-1340.19C(a).

For similar reasons, the sentencing court did not merge this factor with North Carolina General Statute Section 15A-1340.19B(c)(3) regarding the ability to appreciate risk and consequences. *See* N.C. Gen. Stat. § 15A-1340.19B(c)(3). Although the sentencing court used similar language for two findings, the Sentencing Order shows the sentencing court independently considered both factors.

Finally, we again note, it is not our role to override the sentencing court's determinations on the credibility and weight to assign to Defendant's evidence. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406. A sentencing court may assign no weight to a defendant's mental health diagnoses if the court does not find the "defendant's mental health at the time [of the offense] to be a mitigating factor[.]" *See id.* at 679, 818 S.E.2d at 411.

### g. *Familial or Peer Pressure Exerted upon Defendant*

The sentencing court also considered the "[f]amilial or peer pressure exerted" by Defendant's brother on Defendant's actions leading to the 1997 murders. N.C. Gen. Stat. § 15A-1340.19B(c)(7). The sentencing court found (1) "Defendant's closest familial relationship was with his slightly older brother[;]" (2) Defendant, "by his own admission, primarily planned the robbery in South Carolina, and was driving the stolen vehicle at the time Trooper Lowry stopped it[;]" (3) the traffic stop that ultimately led to the death of the two law enforcement officers began escalating when Defendant refused to put his hands behind his back as ordered; and (4) "Defendant appears to have occupied the leadership role in his relationship with his brother and in the commission of their crimes on 23 September 1997." The sentencing court did "not find this factor to have any mitigating weight."

Defendant asserts this was error because the evidence indicates his brother was the initial aggressor on 23 September 1997, and "[i]t is undisputed that [Defendant's brother] escalated the traffic stop by shooting [Trooper] Lowry and

[Deputy] Hathcock[.]"   Defendant asserts his brother "significantly, if not fatally, wounded both officers before [Defendant] engaged in any violence."

Defendant fails to acknowledge the evidence supporting the sentencing court's finding:   Defendant and his brother were closer than Defendant and his mother. Defendant admitted this plan was primarily his.   But Defendant admitted that he did not comply with Trooper Lowry's orders to put his hands behind his back, and the situation began escalating after Defendant refused to follow Trooper Lowry's orders. Further, Defendant removed Trooper Lowry's service weapon from its holster and shot each officer again.   There is competent evidence in the record to support this finding, and the sentencing court was within its discretion to assign this factor no mitigating weight.   *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

> ### h. *Likelihood that Defendant Would Benefit from Rehabilitation in Confinement*

Next, the sentencing court considered the "[l]ikelihood that [Defendant] would benefit from rehabilitation in confinement."   N.C. Gen. Stat. § 15A-1340.19B(c)(8). The sentencing court found Defendant committed "approximately two dozen infractions that resulted in disciplinary action[;]" Defendant spent "almost a decade in solitary confinement due to his participation in an escape plot[;]" "Defendant resisted a strip search in 2014 and threatened a correctional officer with a broom handle[;]" and although his behavior had admittedly improved since 2014, there was "no credible evidence that Defendant has experienced any true rehabilitation and [the

sentencing court] assign[ed] this factor no significant weight."

Defendant does not challenge these findings as unsupported by competent evidence but instead highlights the progress he contends he made between 2014 and the resentencing hearing in 2022. Defendant asserts that he has been reformed, and as a result, he is not among the class of juvenile homicide offenders "who cannot be rehabilitated[.]" *See Kelliher*, 381 N.C. at 587, 873 S.E.2d at 387. Defendant argues that (1) *Kelliher* demands reversal of the life imprisonment without the possibility of parole sentences, and (2) this factor ignores "the undisputed evidence of [Defendant's] substantial growth and improvement while incarcerated."

Much of Defendant's argument is dedicated to showing how he has improved while incarcerated, and therefore, he contends he *must* be considered as capable of rehabilitation within the meaning of *Kelliher* and *Miller*. But Defendant's argument ignores both evidence unfavorable to him and the sentencing court's discretion in weighing the evidence. Defendant's disciplinary records documenting his infractions were admitted into evidence, and Dr. Duquette testified the criminality of men decreases as they mature in their "mid to late 20's[.]" While Defendant may be commended on the improvements he has made while incarcerated, every part of this finding of fact is supported by competent evidence. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

i. *Any Other Mitigating Factor or Circumstance*

Finally, the sentencing court considered additional mitigating factors,

circumstances, and evidence under the catch-all factor in North Carolina General Statute Section 15A-1340.19B(c)(9). *See* N.C. Gen. Stat. § 15A-1340.19B(c)(9). The sentencing court noted that it "in particular, has considered the two mitigating circumstances found by the jury at the time of Defendant's original sentencing hearing: the age of the defendant at the time of the crimes, and the defendant's lack of parental involvement or support in treatment for psychological problems." The sentencing court found "these factors to carry no or little mitigating weight, and the court finds no other mitigating factor or circumstance."

Defendant argues the sentencing court abused its discretion by not giving more weight to what he considered the "catch-all" evidence – "Remorse, Childhood abuse and trauma, and Circumstances of the offense" – to which the sentencing court assigned no weight. Contrary to Defendant's arguments, the sentencing court did consider Defendant's evidence of his remorse, childhood abuse, and the circumstances of the murders in making its findings.

As to remorse, the sentencing court weighed this evidence in factor 8, whether Defendant would benefit from rehabilitation. The sentencing court found Defendant's behavior had improved, but that "improved behavior often accompanies maturation." The sentencing court also found Defendant's behavior had improved only since 2014, shortly after the *Miller* decision, and before 2014 Defendant was frequently disciplined while incarcerated. Further, in the Sentencing Order, the sentencing court explicitly states "[t]he court has considered all the evidence

presented" in its discussion of the catch-all mitigating factors. Along with hearing Defendant's apology, the sentencing court heard evidence that Defendant was made aware before his psychological assessments he could be resentenced under *Miller* to life imprisonment with the possibility of parole and that it was possible Defendant provided untruthful answers to the assessments to skew the results. The sentencing court also heard testimony from Trooper Lowry's widow, which is confirmed by the original trial transcript, that on the day of the original sentencing, "[Defendant] stood up and he looked at me and he said I was gonna tell you I was sorry but I'm not now."

As to Defendant's childhood abuse and trauma, the sentencing court found in factor 6 when considering his mental health issues, that "Defendant suffers from posttraumatic stress disorder as a result of severe childhood physical and emotional abuse. Though this abuse was tragic," the sentencing court determined it was ultimately not worth any mitigating weight.

Finally, regarding the circumstances of the murders, the sentencing court took "judicial notice of the factual summary of the crimes contained in *State v. Golphin*, 352 N.C. 364 (2000)[,]" and fully considered the factual circumstances of the murders. As to all three "catch-all" factors argued by Defendant, the sentencing court considered all Defendant's evidence, and we will not disrupt the sentencing court's weighing of the evidence and testimony on appeal. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

Defendant also asserts the sentencing court erred by "relying upon the jury's

findings[,]" (capitalization altered), from his 1998 trial because the jury's sentencing findings were "based on outdated law–indeed, legal standards subsequently held unconstitutional–and a different evidentiary record." Defendant asserts the findings at issue here were made in an "irrelevant vacuum[,]" even though the jury's findings were mitigating factors for purposes of sentencing Defendant, and the jury's findings could have done nothing but help him in 1998 and during resentencing.

This argument is somewhat baffling as Defendant apparently contends the sentencing court should *not* have considered that a jury had previously found there were circumstances outside of Defendant's control that supported a mitigated sentence. Defendant argues, even though the jury in 1998 agreed his age and mental health disorders weighed in favor of mitigation, these findings should be disregarded. In essence, Defendant argues because the findings were made too early, they must be disregarded, even though the findings were favorable to him.

Defendant's argument as to the jury is without merit. First, we note the sentencing court did not "rely" on the jury's previous findings without consideration of *Miller*. The sentencing court expressly *reconsidered* these findings, and the evidentiary support underlying each, *in light of Miller*. The sentencing court "analyzed Defendant's age and immaturity in numbered paragraphs (1) and (2) above, and the court analyzed Defendant's childhood psychological problems in paragraph number (6) above." For the same reasons we discuss above, there is competent evidence to support the sentencing court's findings as to Defendant's age,

mental health disorders, and lack of treatment for those disorders, and we will not disrupt this finding. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

### j. Incorrigibility

Finally, though not a factor under North Carolina General Statute Section 15A-1340.19B(c), under *Kelliher*, the sentencing court must also find "that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated[.]" *See Kelliher*, 381 N.C. at 587, 873 S.E.2d at 387. Here, the sentencing court found, "Defendant's crimes demonstrate his permanent incorrigibility[.]" While Defendant contends *Kelliher* should control this case as it also involved a 17-year-old in a double murder, the distinguishing factor is that in *Kelliher*, the sentencing court found the defendant was "neither incorrigible nor irredeemable[,]" likely in part based on the fact that the defendant did not pull the trigger for either murder.[2] *Id.* at 559, 873 S.E.2d at 370. Here, after Defendant's brother shot both officers, Defendant shot them both, again. The officers were incapacitated after Defendant's brother first shot them, yet Defendant still removed Trooper Lowry's weapon from its holster and shot each officer again. Thus, *Kelliher* does not prevent the sentencing court from finding Defendant to be permanently incorrigible.

---

[2] While *Kelliher* involved two consecutive sentences of life with parole, "aggregated sentences may give rise to a *de facto* life without parole punishment[.]" *See State v. Kelliher,* 381 N.C. 558, 873 S.E.2d 366 (2022).

*k. Summary*

Ultimately, the Sentencing Order properly addressed each factor as required by North Carolina General Statute Section 15A-1340.19A and *Kelliher*. *See Kelliher*, 381 N.C. at 587, 873 S.E.2d at 387. Defendant did not challenge the sentencing court's findings of fact as unsupported by the evidence, and we do not reconsider the weight the sentencing court assigned to each finding. *See Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406. We acknowledge there is room for different views on the mitigating impact of each factor, but given the sentencing court's findings, the court did not abuse its discretion in sentencing Defendant to consecutive terms of life imprisonment without the possibility of parole. *See Hennis*, 323 N.C. at 285, 372 S.E.2d at 527; *Sims*, 260 N.C. App. at 671, 818 S.E.2d at 406.

## IV. Conclusion

The sentencing court did not abuse its discretion when reviewing the mitigating factors under North Carolina General Statute Section 15A-1340.19B(c), or when it concluded Defendant should be sentenced to life imprisonment without the possibility of parole rather than life imprisonment with the possibility of parole. The Sentencing Order is affirmed.

AFFIRMED.

Chief Judge DILLON and Judge STADING concur.